UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KAIAN BRANDON,

Petitioner,

v.

ERIC ARNOLD, Warden,[1]

Respondent.

Case No. 14-cv-00172-SBA (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Petitioner Kaian Brandon ("Petitioner") brings the instant pro se habeas action under 28 U.S.C. § 2254 to challenge his conviction and sentence rendered in the Alameda County Superior Court for second degree murder and assault on a child causing death. Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby DENIES the Petition for the reasons set forth below.

I.     **BACKGROUND**

   A.     **Statement of Facts**

   The following facts are taken from the unpublished opinion of the California Court of Appeal ("Court of Appeal" or "state appellate court"):

A. Circumstances of Crime

> On Tuesday, November 8, 2005, three-year-old Kiara "Kiki" Irwine was ill with a fever and vomiting. Her mother, Danell Johnson, usually worked a shift from approximately 3:00 a.m. to 9:00 a.m., but she did not go to work on Wednesday, November 9, 2005, opting to stay home and care for her child. Kiara seemed better on Wednesday morning. Her fever had gone down. By the end of the day, the child seemed like herself again. Johnson went to work as usual on Thursday, November 10, 2005. When she returned home about 10:00 a.m. that morning, Kiara seemed fine. Johnson gave the child a shower and dried her off, seeing no bruises on her body. Kiara did not wince or complain of any pain. She played normally on Thursday and seemed to enjoy her dinner that night.

_____

[1] Eric Arnold, the current warden of the prison where Petitioner is incarcerated, has been substituted as Respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

United States District Court
Northern District of California

United States District Court
Northern District of California

On Friday, November 11, 2005, Johnson left her San Leandro apartment to begin her work shift. She left all four of her children—Kiara, six-year-old T., five-year-old K.S. and baby Ke.—in the care of the baby's father, appellant Kaian Brandon. Brandon was employed but was off work that week. Before leaving for her job, Johnson checked on her sleeping children. She saw Kiara nestle down deeper under her cover.

Kiara was still being toilet-trained and she sometimes had accidents. In the morning, Brandon discovered that Kiara had soiled herself and her bed with feces. About 9:00 a.m., while Johnson was still at work, she received an emergency call from Brandon, telling her that Kiara was "lifeless." She told him to call 911 and left immediately for home. When Brandon called 911, the dispatcher advised him how to perform CPR while the paramedics were en route to the home.

Paramedics arrived, finding Kiara lying on her back on the living room floor. Brandon told the paramedics that he found her unconscious on the couch. She was clad only in a shirt. Kiara's skin was warm but she was not breathing. CPR was performed without success; Kiara's heart had stopped. She was transported by ambulance to Eden Medical Center.

By this time, Johnson had arrived at home. As she helped the other children into their coats in Kiara's bedroom, she stepped in feces lying on the floor. Johnson, Brandon and the other children went to the hospital. After 40 minutes of CPR, Kiara still had no heartbeat. She was pronounced dead at the hospital. The doctors told Brandon and Johnson that they suspected that Kiara had suffered a ruptured appendix.

Meanwhile, Alameda County Sheriff Sergeant Richard Carter went to the hospital and observed multiple bruises on Kiara's body. He met with Johnson and Brandon at the hospital. At that point, he conducted an interview, not an interrogation. He particularly wanted to talk with Brandon, the last adult who had been with Kiara.

Brandon told Sergeant Carter that when he went in to check on Kiara, she had defecated on herself in bed. He gave her a bath and returned her to bed. Five minutes later, when he went to check on her, the child was not moving. Kiara was lifeless. He called Johnson, who urged him to call 911, which he did. Brandon told the sheriff that the dispatcher instructed him to do CPR, but that he pushed on her stomach, not her chest. [FN 2] During the interview, Brandon kept saying "I can't believe she's dead."

[FN 2:] The transcript of the 911 call did not suggest that Brandon performed CPR in an incorrect manner.

Sergeant Carter also went to the apartment where Brandon and Johnson lived. He found urine and feces on Kiara's bed sheets. That struck the sheriff as odd when he recalled that Brandon had reported that he took Kiara back to bed after bathing her.

2

Alameda County Sheriff Deputy Duane Fisher also interviewed Brandon later that day.  Brandon told Deputy Fisher that when he went into the bedroom that morning, he discovered that Kiara had defecated on herself.  Brandon said that he put her in a bath and then returned her to her room.  Five minutes later, when Brandon went back into the bedroom to check on Kiara, she was slumped over and unresponsive on the bedroom floor.

On November 14, 2005, a forensic pathologist conducted an autopsy of Kiara's body.  Her head, neck, torso, legs and left arm showed bruising—the result of blunt force trauma.  The body also showed evidence of internal bleeding, organ damage—most significantly, to the liver, pancreas and small intestine—and rib fractures [FN 3] consistent with blunt force trauma.  Later, the pathologist opined that the cause of Kiara's death was multiple blunt injuries.  He explained that these injuries were the result of repeated applications of force by someone other than a child.  They could not have been caused by a fall or by the performance of CPR.  Instead, they were consistent with severe child battering.  Most of these injuries were recent—likely suffered within three days of death. [FN 4] The child would likely have lost consciousness a few minutes after injury.

[FN 3:] One rib fracture was older and already healing.  The two recent ones were highly uncommon in small children, according to an expert on child abuse.

[FN 4:] At trial, a sheriff's detective who witnessed the autopsy testified that the pathologist told him that Kiara's injuries were "very fresh" and had probably occurred within 12 hours of her death.  The pathologist did not believe that the child would have lived any longer than 12 hours with these injuries.

B. Pretrial Matters

On the same day that the autopsy was conducted, Brandon was arrested.  Two days later, he was formally charged with murder and assault on a child causing death. (§ 187, subd. (a); former § 273ab.)  He was arraigned that day and referred to the public defender.  Brandon was soon represented by Deputy Public Defender Bonnie Narby.  In May 2006, Brandon pled not guilty to the charges.

On June 8, 2007, Brandon made a Marsden motion challenging Narby.  (See People v. Marsden (1970) 2 Cal. 3d 118, 122-126 (Marsden).)  The motion was heard in camera on June 15, 2007, before Judge Julia Spain.  Brandon expressed his dissatisfaction with Narby's representation; she responded to these concerns.  Finding that there had been a complete breakdown in the attorney-client relationship, Judge Spain granted the Marsden motion and referred the matter for the appointment of new counsel.  She ordered that a transcript of the hearing be filed under seal.

United States District Court
Northern District of California

On July 9, 2007, [FN 5] the public defender petitioned for writ of mandate in this matter, seeking to overturn Judge Spain's order. The public defender filed a memorandum of points and authorities in support of that petition. It also requested that the transcript of the June 15, 2007 <u>Marsden</u> hearing and its memorandum of points and authorities in support of its petition for writ of mandate be sealed.

[FN 5:] On August 6, 2007, an identical petition was filed. The record contains no explanation why a second petition was filed.

On August 2, 2007, Judge Larry J. Goodman ordered that the <u>Marsden</u> transcript, part of the petition for writ of mandate, and the memorandum of points and authorities in support of that petition be sealed. The next day, Judge Goodman issued an alternative writ of mandate. It appears that no hearing was conducted at this stage—neither Brandon, the prosecutor nor defense counsel were present at the time of the ruling. The alternative writ gave Judge Spain the option of vacating her June 15, 2007 order and reinstating Narby as counsel, or showing why Judge Goodman should not do so. The notice stated that if Judge Spain vacated her earlier order, the alternative writ would be discharged and the petition for writ of mandate denied as moot. The alternative writ was served on Judge Spain three days after issuance. On August 9, 2007, Judge Spain vacated her earlier order, reinstated Narby as Brandon's counsel, and denied the <u>Marsden</u> motion. Deputy Public Defender Charles Denton appeared at this hearing with Brandon. [FN 6] On August 20, 2007, Judge Goodman dismissed the petition for writ of mandate as moot.[FN 7]

[FN 6:] Denton was the same attorney who filed the petition for writ of mandate. To the extent that Brandon argues that this constituted a conflict of interest, even if we assume that this was pretrial error, he has not demonstrated any trial prejudice resulting from it. (See pt. II.B.2., <u>post.</u>)

[FN 7:] Our records offer no evidence that Brandon sought extraordinary writ review of Judge Goodman's order.

A new public defender—someone other than Narby—now represented Brandon. An amended complaint was filed in April 2008, adding two counts of child abuse against Kiara and K.S. committed before Kiara's death, one of them enhanced by the infliction of great bodily injury on a child. (§§ 187, subd. (a), 273a, subd. (a); former §§ 273ab, 12022.7, subd. (d) [Stats. 2002, ch. 126, § 6, pp. 696-697].) Brandon pled not guilty to all four charges and denied the enhancement allegation.

A two-day preliminary examination was conducted at which Brandon was represented by Deputy Public Defender Barbara Dickinson. On September 18, 2008, he was held over for trial on all four charges and the great bodily injury enhancement. (§§ 187, subd. (a), 273a, subd. (a); former §§ 273ab, 12022.7, subd. (d).) On September 26, 2008, he was charged by information with the same four charges, one enhanced by an

allegation of infliction of great bodily injury.  (§§ 187, subd. (a), 273a, subd. (a); former §§ 273ab, 12022.7, subd. (d).)

In October 2008, Brandon pled not guilty to these charges.  He also moved to dismiss the information.  (§ 995.)  That motion was denied on the murder and assault charges, but the two child abuse counts were stricken in March 2009.  (§ 273a, subd. (a).)

C. Prosecution Case-in-chief

Brandon was tried on the remaining two charges in March 2010, represented by Dickinson.  Johnson testified for the prosecution.  She told the jury what she knew about the circumstances of Kiara's death, which had occurred on Brandon's birthday.  She testified that when a detective asked Brandon at the hospital what had happened, he reported that Kiara had soiled herself.  He made her clean up, then sent her to her room after she appeared in the kitchen without any pants on.  She did not come back to the breakfast table, so he went to her room, where he found her lying on the bedroom floor.

Initially, Johnson believed that Kiara had died as the result of a ruptured appendix.  On Monday, November 14, 2005, sheriff's deputies came to the apartment and told Johnson and Brandon that Kiara had not died of natural causes.  Brandon went with the police to talk with them.  Johnson also went to the police station.  While she was gone, Child Protective Services removed T., K.S. and Ke. from the home.  At trial, Johnson admitted that she disciplined her children with a slap or a belt.  She admitted that she sometimes wore a ring.  She denied killing Kiara.

Brandon's 911 call to police was played for the jury.  Brandon had been the only adult with the four children at the time that Kiara was injured.  K.S.—who was nine years old at the time of trial—testified that after Kiara defecated on the floor, Brandon punched her sister in the stomach with a closed fist.

A neighbor testified that she heard a man in the next apartment—the one occupied by Johnson and Brandon—say "I don't care if you die." [FN 8]  She thought this happened on the morning of November 11—the same day that the little girl who lived next door died.  She told the jury that the police had interviewed her the same day.  She told the police that a man and woman had been arguing.  After she learned that the woman was at work, the neighbor changed her statement, saying that she had guessed that the man and woman were arguing.  An audiotape of the statement that the neighbor gave to police was played for the jury.  The neighbor admitted that she did not tell the police about the man's statement until a week or so after the child died.

[FN 8:] When he testified, Brandon denied making this statement and noted that Johnson was not at the apartment the morning that Kiara died.

United States District Court
Northern District of California

A child abuse expert reviewed Kiara's autopsy records.  He opined that she sustained multiple blows to various parts of her body that caused great injury, ultimately causing her death.  He estimated that 30 percent of her body's blood was found in her abdomen.  Her pancreas was torn in half, an uncommon occurrence.  He thought it likely that an extremely powerful traumatic blow to the abdomen pushed Kiara's pancreas against her bones, breaking it.  In his experience, a young child defecating can trigger an adult to anger and child abuse.  The expert opined that if Kiara was behaving normally the day before she died, then her injuries were inflicted after that time.

### D. Challenge to Proposed Impeachment Evidence

After the prosecution rested, Brandon challenged the admissibility of evidence of incidents of violence he committed against his mother and sister.  He argued that the prosecution had failed to disclose the 24 police reports during pretrial discovery, noted that the evidence from 1998 through 2000 was older, and urged the trial court to find that the evidence did not constitute evidence of moral turpitude.  The trial court found that the disclosure was timely, as the reports were sent to defense counsel as soon as the prosecution received them.  It agreed to review the admissibility of specific reports on a case-by-case basis, depending on what Brandon said when he testified.  His motion for acquittal was denied.  (See § 1118.1.)

### E. Defense Testimony

Brandon testified in his own defense.  He told the jury that although he and Johnson argued sometimes, he had been happy living with her and the children.  He recalled that Kiara was still sick—still throwing up—the day before she died.  That Thursday night, Kiara did not eat much dinner.  He did not put the children to bed that night; he assumed that Johnson must have done it.  Brandon was asleep, but he woke up when Johnson was getting ready to go to work.  She told him not to get up, which was unusual.  Normally, he walked her out to her car when she left for work.  He did not do so that night, but went back to sleep after Johnson left.

November 11 was a school holiday, so it was a relaxed morning.  The older siblings came running in for breakfast, but Kiara was moving slowly.  She was wearing training pants, and Brandon saw that she had defecated on herself.  Some of the feces were smeared on her bottom; most of the solid feces had fallen out on the bedroom floor.  He spoke to her in a loud voice about this, but he did not yell at her.  He removed Kiara's clothes and gave her a quick bath [FN 9] so she could eat breakfast with the other children.  He dried her off and told her to go get dressed, which she could do for herself. [FN 10]  He went to get breakfast ready.  Within five minutes, Brandon noticed that Kiara had not come out to the kitchen, so he went to the bedroom.  He found her lying on the floor.

6

[FN 9:] Brandon did not see any bruises on Kiara's body when he took her out of the bath.

[FN 10:] Johnson testified that Kiara needed help getting dressed.

Kiara was not breathing.  Brandon panicked, unsure what to do.  Everything was moving so fast.  There was nothing in her mouth.  He hit Kiara on the back, hoping to dislodge anything blocking her breathing.  He called Johnson and then called 911.  The 911 dispatcher walked him through how to do CPR.  He moved Kiara to the living room floor to do CPR.

The paramedics arrived quickly.  Brandon told the jury that he told one paramedic that he found Kiara in her room and moved her to the living room.  Johnson arrived, the family dressed and they drove over to the hospital.  A doctor told Johnson and Brandon that Kiara was not going to live and that she probably had a ruptured appendix.

Brandon kept the police advised of his whereabouts, knowing that they would want to talk with him.  He had been the only adult in the house on the morning that Kiara died.  He feared that he performed CPR incorrectly, pushing on her stomach rather than her chest.  Brandon told the jury that Kiara's injuries were awful, but that he did not know how the child came to be so injured.  He suggested that Johnson must have beaten Kiara.

On cross-examination, Brandon denied being angry with Kiara that morning or having an anger problem.  He denied holding a gun to his mother's head and threatening to kill her.  He told the jury that he was not the kind of man who hit his mother.  He admitted having been arrested, but only for an outstanding warrant based on a gun incident.

A sidebar conference was conducted.  When the prosecution inquired about Brandon's arrest history, defense counsel objected to the admission of the proffered evidence.  She argued that the evidence was irrelevant, pertaining only to a collateral matter.  She asked that the prosecutor be found to have committed misconduct and moved for a mistrial.  The motion was denied.  Defense counsel also objected to improper impeachment with character evidence, without success.

The prosecutor asked Brandon about numerous alleged incidents.  She asked whether he struck his mother in the lip in March 1998; [FN 11] whether he knocked his sister down when she came to their mother's aid; and whether he pulled numerous items off the garage shelves.  Brandon denied that this incident happened.  The prosecution asked if in July 1998, his mother called the police because Brandon was throwing things and breaking things in the house; and if he told the police that she was afraid of him and that he acted this way every day.  Brandon admitted that the police were called.  When asked about an October 2000 gun incident that was the

basis of the outstanding warrant, Brandon testified that "the gun incident didn't happen." Specifically, Brandon denied that he held a gun to his mother's head and said, "Bitch, I'll kill you." He was asked whether, in August 1998, he responded to his mother's request to stop smoking in the house by yelling, flipping over a mattress, spitting in her face, throwing a plant at her, and hitting her in the back of the head. Brandon denied doing so.

[FN 11:] Brandon was 17 or 18 years old at that time.

When asked if his mother declined to press charges when these acts of violence occurred, Brandon said that his mother made false police reports to get him in trouble and later recanted because the charges were untrue. He admitted being angry with his mother at times, but he denied ever hitting her or pulling a gun on her. He did not recall arguing with his mother in December 1998 about breaking the garage door or slamming her finger in the door. Brandon admitted fighting with his sister, but he did not recall hitting her in January 1999 because she would not let him copy her homework. He pushed her, but did not punch her. He admitted that his mother got a restraining order against him after he intentionally broke a window at her house. He broke the window because he was hurt that his mother lied to police and said that he had threatened her with a gun.

Brandon told the jury that only he and Johnson had access to Kiara shortly before she died. He did not hurt Kiara; so it must have been that Johnson did. When the police asked him shortly after the incident whether Johnson hit the children, he told them she did not, to keep Johnson from getting in trouble. He did not suggest that Johnson hurt Kiara when the police questioned him.

Testifying for the defense, a doctor who attended Kiara at the hospital observed that she had a ring-shaped bruise on one buttock.

F. Verdict and Sentence

The jury acquitted Brandon of first degree murder, but found him guilty of the lesser included offense of second degree murder. He was also convicted of an assault on a child causing death. (§ 187, subd. (a); former § 273ab.) His motion for new trial on grounds of prosecutorial misconduct was denied. (§ 1181, subd. 5.) He was sentenced to an indeterminate term of 25 years to life in state prison for the assault and a concurrent 15-year-to-life term for second degree murder.

People v. Brandon, No. A129068, 2012 WL 5193425, *1-6 (Cal. Ct. App. Oct. 22, 2012)

(footnotes in original).

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### B.   Case History

Petitioner appealed his conviction to the California Court of Appeal, which affirmed the judgment in an unpublished decision on October 22, 2012.  Brandon, 2012 WL 5193425, at *17; Resp't Ex. 13.  On November 12, 2012, the California Court of Appeal denied a petition for rehearing.  Resp't Ex. 15.  The California Supreme Court denied review on January 23, 2013.  Resp't Ex. 17.

On January 13, 2014, Petitioner filed the instant Petition.  Dkt. 1.  Pursuant to the Court's Order to Show Cause (Dkt. 4), Respondent has filed an Answer to the Petition (Dkt. 8).  Petitioner has not filed a Traverse, and the deadline for doing so has expired. The matter is fully briefed and ripe for adjudication.

## II.   LEGAL STANDARD

A petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  The Court may entertain such a writ petition "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  A district court may not grant a petition challenging a state conviction on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); or "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2).

### A.   28 U.S.C. § 2254(d)(1)

To determine whether a state court ruling was "contrary to" or involved an "unreasonable application" of federal law under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the United States Supreme Court which existed at the time the petitioner's state court

conviction became final.  Williams v. Taylor, 529 U.S. 362, 412 (2000); Harrington v. Richter, 562 U.S. 86, 102 (2011).  A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent."  Williams, 529 U.S. at 405-06.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.

On federal habeas review, AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt."  Renico v. Lett, 559 U.S. 766, 773 (2010) (internal quotation marks omitted).  In applying the above standards on habeas review, this Court reviews the "last reasoned decision" by the state court.  See Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  The last reasoned decision in this case is the Court of Appeal's unpublished disposition issued on October 22, 2012, in which the state appellate court considered most of Petitioner's claims.  See Resp't Ex. 13.

**B.     28 U.S.C. § 2254(d)(2) and (e)(1)**

A federal habeas court may grant a writ if it concludes a state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  An unreasonable determination of the facts occurs where a state court fails to consider and weigh highly probative, relevant evidence, central to a petitioner's claim that was properly presented and made part of the state court record.  Taylor v. Maddox,

366 F.3d 992, 1005 (9th Cir. 2004).  A district court must presume correct any determination of a factual issue made by a state court unless a petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1). The presumption of correctness applies to express and implied findings of fact by both trial and appellate courts.  Sumner v. Mata, 449 U.S. 539, 546-47 (1981); see Williams v. Rhoades, 354 F.3d 1101, 1108 (9th Cir. 2004) ("On habeas review, state appellate court findings—including those that interpret unclear or ambiguous trial court ruling—are entitled to the same presumption of correctness that we afford trial court findings.").

Section 2254(d)(2) applies to an intrinsic review of a state court's fact-finding process, or situations in which the petitioner challenges a state court's fact-findings based entirely on the state court record, whereas § 2254(e)(1) applies to challenges based on extrinsic evidence, or evidence presented for the first time in federal court.  See Taylor, 366 F.3d at 999-1000.  In Taylor, the Ninth Circuit established a two-part analysis under §§ 2254(d)(2) and 2254(e)(1).  Id.  First, federal courts must undertake an "intrinsic review" of a state court's fact-finding process under the "unreasonable determination" clause of § 2254(d)(2).  Id. at 1000.  The intrinsic review requires federal courts to examine the state court's fact-finding process, not its findings.  Id.  Once a state court's fact-finding process survives this intrinsic review, the second part of the analysis begins by addressing the state court's finding of a presumption of correctness under § 2254(e)(1).  Id. According to the AEDPA, this presumption means the state court's fact-finding may be overturned based on new evidence presented by a petitioner for the first time in federal court only if such new evidence amounts to clear and convincing proof that a state court's findings are in error.  See 28 U.S.C. § 2254(e)(1).  "Significantly, the presumption of correctness and the clear-and-convincing standard of proof only come into play once the state court's fact-findings survive any intrinsic challenge; they do not apply to a challenge that is governed by the deference implicit in the 'unreasonable determination' standard of section 2254(d)(2)."  Taylor, 366 F.3d at 1000.

1    If constitutional error is found, habeas relief is warranted only if the error had a

2    "substantial and injurious effect or influence in determining the jury's verdict." Penry v.

3    Johnson, 532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638

4    (1993)).

5    **III.    DISCUSSION**

6    Petitioner asserts a number of claims that generally fall into the following

7    categories:  (1) claims related to the denial of his motion to substitute counsel pursuant to

8    People v. Marsden, 2 Cal. 3d 118 (1970); (2) claims of instructional error; and (3) a claim

9    of cumulative error.  See Dkt. 1 at 8-33.  These claims, including sub-claims, are

10   addressed seriatim.

11   **A.    Marsden-Related Claims**

12   Within the first five unorganized sections of the claims portion of his petition,

13   Petitioner raises several claims in connection with the initial grant and subsequent denial

14   of his pretrial Marsden motion.  Id. at 8-26.  Petitioner raised these claims before the

15   California Court of Appeal, which rejected each of his arguments.  See Brandon, 2012 WL

16   5193425, at *7-12.  For clarity, the Court addresses these claims in the order laid out by

17   the California Court of Appeal in its decision on direct appeal, as opposed to the order in

18   which Petitioner raises them in his petition.

19   **1.    "Cancellation" of Judge Spain's Marsden Ruling**

20   As noted, on June 15, 2007, Judge Spain, upon finding a breakdown in the attorney-

21   client relationship, granted Petitioner's Marsden motion.  Shortly thereafter, the public

22   defender's office filed a writ petition, seeking to vacate Judge Spain's ruling.  The petition

23   was heard by Judge Goodman, who issued an alternative writ, which, in turn, led Judge

24   Spain to vacate her decision.

25   Petitioner contends that Judge Goodman erred by issuing a writ of mandate

26   "canceling" the order for appointment of new counsel and requiring Petitioner to proceed

27   to trial with the previously discharged counsel. Dkt. 1 at 8.  But as the Court of Appeal

28   correctly found, Judge Goodman did not "cancel[]" Judge Spain's order.  Brandon, 2012

United States District Court
Northern District of California

12

1    WL 5193425, at *7.  "Instead, [Judge Goodman] issued an alternative writ, prompting

2    Judge Spain herself to vacate her order granting Brandon's Marsden motion and enter a

3    new order denying that motion."  Id.  The state appellate court further noted that Petitioner,

4    in fact, was *not* represented at trial by his previously discharged counsel, Deputy Public

5    Defender Bonnie Narby ("Narby").  Id.  Instead, Deputy Public Defender Barbara

6    Dickinson ("Dickinson") took over as defense counsel.  Id.  These factual findings are

7    presumed correct.  28 U.S.C. § 2254(e)(1).  Petitioner fails to rebut them by clear and

8    convincing evidence.  Relief on this claim is DENIED.

9                            **2.    Void Order**

10       Petitioner contends that Judge Goodman's order was void on the ground that one

11   superior court judge has no jurisdiction to review the ruling of another superior court

12   judge.  Dkt. 1 at 9, 20-23.  In rejecting this claim, the state appellate court explained that

13   "Brandon ignores a key fact—that Judge Spain sat as a magistrate when she first granted

14   the Marsden motion."  Brandon, 2012 WL 5193425, at *7.  Under California law, "the

15   early stages of a criminal case are conducted before a superior court judge who sits as a

16   magistrate."  Id.  As such, Judge Goodman, acting as a superior court judge, had the

17   authority and jurisdiction to review a decision by Judge Spain, since her Marsden ruling

18   was issued in her capacity as a magistrate.  Id. ("As the proceedings before a magistrate are

19   limited in nature, a judge sitting as a magistrate is deemed to be inferior to a superior court

20   judge for purposes of mandamus review.") (citing People v. Superior Court (Jimenez), 28

21   Cal. 4th 798, 803 (2002), People v. Uhlemann, 9 Cal. 3d 662, 667 (1973)).

22       Petitioner has made no argument or cited any evidence in the record to demonstrate

23   that the state appellate court's decision in this issue was either contrary to, or involved an

24   unreasonable application of, clearly established Federal law.  Nor has he shown that such

25   decision was based on an unreasonable determination of the facts in light of the evidence

26   presented in the state court proceeding.[2]  Accordingly, relief on this claim is DENIED.

27   _____

28       [2] To the extent Petitioner is complaining that the state appellate court incorrectly
     applied state law, such claim is not cognizable in a federal habeas action.  Estelle v.

United States District Court
Northern District of California

13

### 3.    Fair Trial and Prejudice

Petitioner contends the denial of his <u>Marsden</u> motion prior to his preliminary hearing violated his right to the effective assistance of counsel.  He also claims that the error was structural, which therefore entitles him to reversal without a showing of prejudice.  Dkt. 1 at 9-14.

#### a.    Background

Petitioner's <u>Marsden</u> hearing took place on June 15, 2007, approximately a year after Petitioner pleaded not guilty to the charges.  At the hearing, Petitioner conceded as follows: "I can't say [Deputy Public Defender Narby] hasn't properly represented me." Resp't Ex. 6, June 15, 2007 RT 2.  Rather, Petitioner was concerned that Narby was not giving his case sufficient attention and that she was advising him that accepting a plea offer of 15-years-to-life was the best option for him.  June 15, 2007 RT 2-3.

Narby informed the trial court that she has been a criminal defense attorney for twenty-three years, three of which were practicing criminal appellate appeals.  June 15, 2007 RT 4-6.  She explained that she had represented defendants in over 300 preliminary hearings, tried over 50 cases, and handled about 10 homicides, none of which went to trial. June 15, 2007 RT 4-6.  With regard to Petitioner's case, Narby noted that Petitioner was charged with beating to death a child who was in his custody and care, and that the only other person with access to Kiara—her mother—was an unlikely suspect.  June 15, 2007 RT 6.  Narby added that she spent two hours with the coroner discussing the autopsy and was well aware of the evidence against her client.  June 15, 2007 RT 7-9.  Narby confirmed that the prosecutor had offered a 15-years-to-life deal that would expire at the end of the week.  June 15, 2007 RT 9.  She believed this was a good offer because Petitioner would otherwise face a 25-years-to-life sentence for assault on a child under age eight resulting in death (even without proving murder or an intent to kill).  June 15, 2007

<u>McGuire</u>, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

1    RT 9-12.  She believed that that the results for Petitioner would be far worse if he

2    proceeded to trial.[3]  June 15, 2007 RT 12.

3         Petitioner responded that he was innocent, that he had told Narby he saw Johnson

4    hit her children and that he wanted to go to trial.  June 15, 2007 RT 12-19.  Judge Spain

5    found a complete breakdown in the relationship between Petitioner and Narby and granted

6    the motion for new counsel.  June 15, 2007 RT 19-20.  Narby asked Judge Spain if her

7    ruling was based on whether or not Narby should have followed up on Petitioner's

8    allegation that Johnson hit her children.  June 15, 2007 RT 20.  Judge Spain responded that

9    her ruling was based on Petitioner's lack of confidence in her.  June 15, 2007 RT 20.

                            ***b.       Analysis***

11        The Sixth Amendment right to counsel guarantees an accused the rights to conflict-

12   free representation and the effective assistance of counsel.  See Wheat v. United States,

13   486 U.S. 153, 156 (1988).  At the same time, the constitution "does not guarantee a

14   'meaningful relationship' between a client and his attorney."  Stenson v. Lambert, 504

15   F.3d 873, 886 (9th Cir. 2007) (quoting Morris v. Slappy, 461 U.S. 1, 14 (1983)).  The

16   Sixth Amendment is violated only where the defendant is forced "to go to trial with an

17   attorney with whom he has an irreconcilable conflict"—i.e., "where there is a complete

18   breakdown in communication between the attorney and client, and the breakdown prevents

19   effective assistance of counsel."  Id.  On federal habeas review, the "ultimate constitutional

20   question" is whether the state trial court's denial of a Marsden motion "actually violated

21   [the petitioner's] constitutional rights in that the conflict between [the petitioner] and his

22   attorney had become so great that it resulted in a total lack of communication or other

23   significant impediment that resulted in turn in an attorney-client relationship that fell short

24   of that required by the Sixth Amendment."  Schell, 218 F.3d at 1026.

25        The state appellate court determined that the denial of Petitioner's pretrial Marsden

26   motion did not deprive him of a fair trial or result in prejudice.  See Brandon, 2012 WL

27

28        ───────────────
          [3] As mentioned above, Petitioner was convicted and sentenced to 25 years to life.

                                    15

United States District Court
Northern District of California

1    5193425, at *8.  The court noted that the crux of the complaint was that Narby did not

2    afford Petitioner's case the amount of attention it deserved, and that she had urged him to

3    accept the plea deal instead of proceeding to trial, notwithstanding his claim of innocence.

4    Id.  Moreover, the court explained that since Petitioner raised no Marsden challenge to his

5    trial counsel (Dickinson), he could not show that the denial of his Marsden motion as to

6    Narby had any bearing on the result at trial.  Id.  With that, the state appellate court

7    concluded that "even if we found that Judge Spain erred by denying Brandon's pretrial

8    Marsden motion, that error would be harmless beyond a reasonable doubt, because it did

9    not affect his subsequent trial."  Id.

10         The record does not support the conclusion that an irreconcilable conflict existed

11   between Petitioner and Narby.  Nor is there support for the notion that Narby did not

12   afford the requisite amount of time and attention to Petitioner's case.  To the contrary, the

13   record shows that Narby conducted an investigation regarding the evidence against

14   Petitioner, including a lengthy consultation with the coroner to review the autopsy.  In

15   view of that evidence, and the nature of the charges alleged against Petitioner, Narby

16   reasonably recommended that he accept the proposed plea deal.  The fact that Petitioner

17   was ultimately convicted and received a substantially more severe sentence than under the

18   proposed plea deal underscores the wisdom of her advice.  See Plumlee v. Masto, 512 F.3d

19   1204, 1210-11 (9th Cir. 2008) (en banc) (finding no Sixth Amendment violation where no

20   actual conflict existed between defendant and public defender's office, but defendant

21   refused to cooperate with counsel because of his dislike or distrust of the office); Larson v.

22   Palmateer, 515 F.3d 1057, 1067 (9th Cir. 2008) (no relief under AEDPA for defendant

23   who did not argue counsel had either an actual or apparent conflict of interest, and instead

24   complained only about lack of communication with counsel and counsel's strategic

25   decisions, such as not making motions defendant had requested, contacting witnesses

26   without defendant's consent, and not providing defendant with a defense witness list for

27   his approval).

28         In any event, any conflict between Petitioner and Narby ultimately was inapt

United States District Court
Northern District of California

16

because Petitioner was represented at trial by Deputy Public Defender Dickinson—against whom Petitioner had not made any <u>Marsden</u> challenge.  In sum, in light of applicable holdings of the Supreme Court and on the basis of the record as a whole, the state appellate court's determination—that there was no irreconcilable conflict and that any such conflict would have been harmless—was not contrary to or an unreasonable application of federal law.  Relief on this claim is DENIED.

### 4.    Judicial Misconduct

Petitioner next claims that Judge Goodman exhibited judicial bias in issuing the alternative writ order. Dkt. 1 at 9.  According to Petitioner, Judge Goodman had a conflict because the petition for writ of mandate named the superior court as a party.  He also asserts that another court should have decided the petition on the ground that Judge Goodman was financially motivated to overturn Judge Spain's <u>Marsden</u> ruling in order to save the court from having to expend resources to retain new counsel for Petitioner. Petitioner apparently bases this contention on an argument to that effect as set forth in the public defender's office's writ petition.  <u>Brandon</u>, 2012 WL 5193425, at *9.  The state appellate court rejected Petitioner's claim on both procedural and substantive grounds.  <u>Id.</u> First, the court found that Petitioner forfeited the claim by failing to raise the issue at the trial court level.  <u>Id.</u>  Second, the court concluded that there was no evidence to support a claim of judicial bias.  <u>Id.</u>

It is well settled that due process "clearly requires a 'fair trial in a fair tribunal' before a judge with no actual bias against the defendant or interest in the outcome of his particular case." <u>Bracy v. Gramley</u>, 520 U.S. 899, 904-905 (1997) (quoting <u>Withrow v. Larkin</u>, 421 U.S. 35, 46 (1975)).  A claim of judicial misconduct by a state judge in the context of federal habeas review does not simply require that the federal court determine whether the state judge committed judicial misconduct; rather, the question is whether the state judge's behavior "rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." <u>Duckett v. Godinez</u>, 67 F.3d 734, 740 (9th Cir. 1995) (citations omitted).  To succeed on a judicial bias claim, a petitioner must

"overcome a presumption of honesty and integrity in those serving as adjudicators." Withrow v. Larkin, 421 U.S. 35, 47 (1975).

Aside from Judge Goodman's ruling on the writ petition, Petitioner fails to identify any evidence in the record to support his claim of judicial bias. An adverse court ruling, standing alone, is insufficient to sustain a claim for habeas relief. See Larson v. Palmateer, 515 F.3d 1057, 1067 (9th Cir. 2008) (affirming denial of habeas relief on judicial misconduct claim "[b]ecause [the petitioner] has provided no evidence of the trial court's alleged bias outside of these rulings and remarks—which themselves revealed little more than the occasional mild frustration with [the petitioner]'s pro se lawyering skills—his claim that he was denied a fair trial also fails."). Furthermore, Petitioner fails to present any evidence to overcome the presumption of correctness of the state appellate court's finding of judicial integrity. His claim that Judge Goodman was biased by having a financial interest in the outcome lacks any factual or legal support. Relief on this claim is DENIED.

### 5. Denial of Hearing

Petitioner claims that he was denied a hearing in connection with Judge Goodman's consideration of the petition for writ of mandate. Dkt. 1 at 19. The Court liberally construes this claim as one for the denial of due process.

Respondent argues this claim is unexhausted. To exhaust a habeas claim, the petitioner must provide the highest state court with a full and fair opportunity to consider each claim before presenting it to the federal court. Duncan v. Henry, 513 U.S. 364, 365 (1995). Here, Petitioner raised this claim for the first time in his petition for rehearing before the California Court of Appeal, which is improper. See People v. Mascotti, 206 Cal.App.2d 772, 780 (1962) ("It is the settled rule of this court that points made for the first time on petition for rehearing will not be considered."). Since petitioner raised the claim in a procedural context in which it would not be considered, he did not fairly present it to the state court. See Castille v. Peoples, 489 U.S. 346, 351 (1989).

Even if the aforementioned claim were exhausted, it otherwise fails on the merits. See 28 U.S.C. § 2254(b)(2) (allowing district court to deny unexhausted claim on its merits). Petitioner does not dispute that he received a plenary hearing on his Marsden motion. Instead, Petitioner complains that he should have received a hearing in relation to the subsequent writ petition before Judge Goodman. Petitioner cites no authority—nor is the Court aware of any—holding that a defendant has a constitutional right to such a hearing. To the contrary, the decision of whether the conduct such a hearing is discretionary. See United States v. Smith, 282 F.3d 758, 764 (9th Cir. 2002) ("the failure to conduct a hearing [on a motion for substitute counsel] is not *by itself* an abuse of discretion"). Moreover, as the state appellate court noted, Judge Goodman possessed a transcript of the June 2007 Marsden hearing conducted by Judge Spain and therefore could sufficiently review the matter of substitution based on the record. Brandon, 2012 WL 5193425, at *3; see 28 U.S.C. § 2254(e)(1) (presumption of correctness as to factual findings). Relief on this claim is DENIED.[4]

### 6.    Subsequent Marsden Motion

Petitioner claims that the trial court should have conducted a hearing in connection with a "second" Marsden motion he allegedly made at an August 9, 2007 hearing.[5] At that hearing, Judge Spain indicated her intention to vacate her prior ruling on his Marsden motion and to reinstate Narby as his counsel. Dkt. 1 at 17-18. The state appellate court rejected this claim, finding that Petitioner did not, in fact, make a second Marsden motion. Rather, the court explained that "[a] Marsden motion requires some clear indication that a

_____

[4] To the extent Petitioner contends that he was denied a hearing when Judge Spain reviewed Judge Goodman's alternative writ, see Dkt. 1 at 19, the record demonstrates that Judge Spain actually did hold a hearing on August 9, 2007, see Resp't Ex. 8. As an ancillary matter, Petitioner contends that he was improperly denied counsel in the writ proceedings before Judge Goodman and during the August 9, 2007 hearing before Judge Spain. Dkt. 1 at 19. These claims also lack merit because Petitioner had no right to separate counsel in connection with the Marsden proceedings. See LaGrand v. Stewart, 133 F.3d 1253, 1277 (9th Cir. 1998).

[5] As noted, on or about August 3, 2007, Judge Goodman issued an alternative writ of mandate regarding Judge Spain's ruling on Petitioner's Marsden ruling.

United States District Court
Northern District of California

United States District Court
Northern District of California

criminal defendant seeks substitute counsel," and that was based on the colloquy between Petitioner and Judge Spain, Petitioner's statements were merely "an expression of his intent to file a Marsden motion in the future, not to make such a motion at the August 9, 2007 hearing." Brandon, 2012 WL 5193425, at *10.

The state court's determination that Petitioner's did not make a second Marsden motion was reasonable in light of the record presented. Cf. Stenson v. Lambert, 504 F.3d 873, 883 (9th Cir. 2007) ("We hold that the Washington Supreme Court's holding that Stenson's request at trial was 'not unequivocal,' … [and] was not 'based on an unreasonable determination of the facts.'") (quoting in part 28 U.S.C. § 2254(d)(2)).  In any event, any failure to conduct a hearing on Petitioner's alleged second Marsden motion did not violate Petitioner's federal constitutional rights.  First, as discussed above, no Supreme Court case holds that a criminal defendant is entitled to substitute counsel due to his unsubstantiated distrust of his attorney.  Consequently, by extension, the state appellate court's ruling cannot constitute an unreasonable application of federal law.  See Plumlee, 512 F.3d at 1211.  Second, because Petitioner's putative subsequent motion occurred immediately upon denial of his first Marsden motion, no hearing was necessary because Petitioner had a full opportunity to explain his reasons for requesting substitution at the first Marsden hearing.  King v. Rowland, 977 F.2d 1354, 1357 (9th Cir. 1992) (noting that the extent of the court's inquiry need only be as comprehensive as the circumstances reasonably permit).  Notably, Petitioner does not identify any additional arguments he would have made at a second hearing had one been afforded.  Relief on this claim is DENIED.

### 7.    Conflict of Interest

Petitioner contends that his conviction should be reversed because he was represented before and at trial by a public defender who should have been disqualified for a conflict of interest. Dkt. 1 at 24-26. He reasons that by petitioning for a writ of mandate to overturn Judge Spain's order granting his Marsden motion, the entire public defender's office acted against his interests.  Id. at 24.  In addition, he asserts that the public

20

United States District Court
Northern District of California

1    defender's continued representation of him caused Judge Spain to vacate her order

2    granting that motion, and that his public defender failed to represent him properly

3    thereafter.  Id. at 25.

4          The Sixth Amendment right to conflict-free counsel is violated only if "(1) counsel

5    actively represented conflicting interests; and (2) an actual conflict of interest adversely

6    affected counsel's performance."  Rich v. Calderon, 187 F.3d 1064, 1069 (9th Cir. 1999)

7    (citations omitted); United States v. Mett, 65 F.3d 1531, 1535-36 (9th Cir. 1995).  "An

8    'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely

9    affects counsel's performance."  Mickens v. Taylor, 535 U.S. 162, 172 n.5 (2002); see

10   United States v. Wells, 394 F.3d 725, 733 (9th Cir. 2005).  "'[A]n actual conflict of

11   interest' mean[s] precisely a conflict that affected counsel's performance—as opposed to a

12   mere theoretical division of loyalties."  Mickens, 535 U.S.at 171.  Habeas relief is

13   unavailable where the petitioner fails "to establish that the conflict of interest adversely

14   affected his counsel's performance."  Id. at 174.  Automatic reversal for a conflict of

15   interest is available "only where defense counsel is forced to represent codefendants over

16   his timely objection, unless the trial court has determined that there is no conflict."  Id. at

17   168.

18         The state appellate court determined that counsel's performance was not adversely

19   affected by a conflict of interest, reasoning as follows:

20               Overall, it appears to us that trial counsel vigorously
        defended Brandon's case.  She made repeated efforts to keep
21      impeachment evidence from the jury.  (See, e.g., People v.
        Frye (1998) 18 Cal. 4th 894, 998-999, disapproved on other
22      grounds in Doolin, supra, 45 Cal. 4th at p. 421, fn. 22 [defense
        counsel at odds with prosecution].)  She argued—based on
23      slim evidence—that because Johnson also had an opportunity
        to have injured Kiara, a reasonable doubt existed about
24      Brandon's guilt.

25               Brandon's claim that trial counsel failed to call
        witnesses who could testify about his good character does not
26      establish incompetence.  The decision whether to call witnesses
        is generally considered to be a matter of trial tactics for defense
27      counsel to determine.  A disagreement between a defendant
        and defense counsel about trial tactics does not constitute a
28      conflict of interest.  (See People v. Williams, supra, 2 Cal. 3d

1

at p. 905 [appointment of another attorney not required].)  As we shall explain, the bad character evidence that Brandon complains of was proper impeachment.  (See pt. III., <u>post</u>.)  Even if we assume a conflict of interest, nothing in the record on appeal establishes that a different course of action would have produced convincing evidence of good character.  (See, e.g., <u>Rundle</u>, <u>supra</u>, 43 Cal. 4th at p. 174.)

2

3

4

5

Brandon's remaining claim—that defense counsel was incompetent for allowing the trial court to commit two instructional errors—also fails because, as we shall explain, those errors were harmless.  (See pt. IV., <u>post</u>.)

6

7

<u>Brandon</u>, 2012 WL 5193425, at *12.

8

As a threshold matter, Petitioner fails to identify any evidence in the record or any

9

legal authority to establish the existence of an actual conflict between himself and the

10

entire public defender's office.  That aside, the Court finds that the state appellate court's

11

conclusion that Petitioner was not affected by any potential conflict of interest is

12

reasonable.  As indicated, Deputy Public Defender Dickinson took over for Narby after

13

Judge Spain vacated her original ruling on Petitioner's <u>Marsden</u> motion.  <u>Id.</u>, *3; 1CT 4-

14

224.  Thereafter, Dickinson represented Petitioner at his preliminary hearing on August 21,

15

2008, and September 18, 2008, as well as at trial in March 2010.  <u>Id.</u>, at *4; 1RT 1.  The

16

record shows that Dickinson vigorously defended Petitioner against the charges pending

17

against him.  Prior to trial, Dickinson filed motions to set aside the entire Information, for

18

disclosure of medical records and psychotherapist-patient records concerning Kiara's older

19

siblings, and to declare these siblings as incompetent to testify, as well as several motions

20

in limine.  1CT 231-232, 240-252; 2CT 285-301.  During trial, after the prosecution rested,

21

Dickinson: (1) challenged the admissibility of evidence of incidents of violence Petitioner

22

committed against his mother and sister' (2) sought to limit the use of the 911 call;

23

(3) moved to exclude evidence of uncharged prior bad acts pursuant to California Evidence

24

Code § 1101; and (4) moved for acquittal pursuant to California Penal Code § 1118.1.

25

2RT 431-437.

26

Similarly, Dickinson aggressively defended Petitioner during trial.  Dickinson

27

called two witnesses to testify on behalf of the defense:  Dr. Ralph D'Amato (an

28

emergency room doctor) and Petitioner.  2RT 438-505.  During the prosecutor's cross-

United States District Court
Northern District of California

examination of Petitioner, she asked Petitioner if he had an "anger problem"; after Petitioner denied that he did, the prosecutor began asking him about certain uncharged prior bad acts to which Dickinson objected. 2RT 474-475. After discussions at side bar, the prosecutor began asking Petitioner about his arrest record. 2RT 475. Dickinson objected, accused the prosecutor of misconduct, and moved for a mistrial, which was denied. 2RT 475. The prosecutor then continued to question Petitioner about his arrest record as well as various uncharged prior bad acts involving his mother and sister, and Dickinson continued to object until the trial court noted it as a "standing objection." 2RT 475-483. Dickinson also objected to the prosecutor questioning Petitioner about why he "never said Danell [Johnson] did it" during the four and a half years he faced murder charges. 2RT 495-497. Dickinson objected to it as improper, moved for misconduct, and moved for a mistrial. 2RT 496. When the trial court overruled Dickinson's objections, the prosecutor continued this line of questioning, but Dickinson again objected to it because she was "afraid" the prosecutor would be "going to get into attorney-client confidentiality." 2RT 496-497. The trial court again overruled the objection because it was "impeachment." 2RT 497. Finally, in her closing argument, Dickinson argued that a reasonable doubt existed as to Petitioner's guilt because Johnson had equal access to Kiara prior to her death and could have been responsible for the beating. 2RT 558-568. In sum, the Court finds that the state appellate court's determination that trial counsel "vigorously defended" Petitioner was reasonable "in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

### 8. Ineffective Assistance of Counsel

Petitioner next contends his trial counsel failed to provide competent representation by failing to: (1) call witnesses to testify to his good character in order to counter the prosecution bad character evidence; (2) ensure that the trial court instructed the jury to consider his unrecorded statements with caution; and (3) require the trial court to correctly instruct the jury on involuntary manslaughter. Dkt. 1 at 25-26.

The clearly established federal law governing claims of ineffective assistance of

counsel ("IAC") is set forth in Strickland v. Washington, 466 U.S. 668 (1984).  Under

Strickland, a defendant must show that (1) his counsel's performance was deficient and

that (2) the "deficient performance prejudiced the defense." Id. at 687.  Counsel is deemed

constitutionally deficient if his or her representation "fell below an objective standard of

reasonableness" such that it was outside "the range of competence demanded of attorneys

in criminal cases." Id. at 687-88 (internal quotation marks omitted).  Tactical decisions of

trial counsel are entitled to deference when: (1) counsel, in fact, predicates his trial conduct

on strategic considerations; (2) counsel makes an informed decision based upon

investigation; and (3) the decision appears reasonable under the circumstances. See

Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994).  Whether counsel's actions were

indeed tactical is a question of fact considered under 28 U.S.C. § 2254(d)(2); whether

those actions were reasonable is a question of law considered under 28 U.S.C.

§ 2254(d)(1).  Edwards v. LaMarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).

With the passage of the AEDPA, habeas relief may only be granted if the state-

court decision unreasonably applied this general Strickland standard for ineffective

assistance. Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).  Accordingly, the question

"is not whether a federal court believes the state court's determination under the Strickland

standard "was incorrect but whether that determination was unreasonable—a substantially

higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Knowles, 556 U.S. at

123.  The AEDPA standard is "doubly deferential" because it requires a showing not only

that the state court determination was erroneous, but that it was also objectively

unreasonable. Yarborough v. Gentry, 540 U.S. 1, 5 (2003).

Here, the state appellate court reasonably construed trial counsel's decision not to

introduce good character evidence as a tactical decision, which does not present a claim of

constitutional magnitude. See Demirdjian v. Gipson, 832 F.3d 1060, 1066-67 (9th Cir.

2016) (noting that Strickland "mandates a 'strong presumption' that counsel acted 'for

tactical reasons rather than through sheer neglect.'") (quoting Yarborough v. Gentry, 540

U.S. 1, 8 (2003) (per curiam)); see also Matylinsky v. Budge, 577 F.3d 1083, 1091 (9th

United States District Court
Northern District of California

Cir. 2009) (the court may "neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight"). In any event, Petitioner's failure to identify any witnesses to his good character is also fatal to this allegation of incompetence. As for the two claims of instructional error, the state appellate court concluded that any errors were harmless. Brandon, 2012 WL 5193425, at *12. As will be discussed in more detail in the section below addressing Petitioner's instructional error claims, the Court agrees that even if the aforementioned instructions had been either given or corrected, there is no reasonable probability that the verdict would have been different. Therefore, Petitioner has failed to show that he was prejudiced by counsel's failure to alert the trial court about these instructions. See Pulido v. Chrones, 629 F.3d 1007, 1019-20 (9th Cir. 2010) (petitioner did not suffer prejudice under Brecht because judgment was not substantially swayed by instructional errors). Accordingly, applying the doubly-deferential standard of review, the Court finds that the state appellate court did not unreasonably apply Strickland in rejecting his IAC claim. Relief on Petitioner's IAC claim is therefore DENIED.

### B.    Instructional Error

Petitioner raises two claims of instructional error. Dkt. 1 at 27-32. First, he contends that the trial court erred by failing to instruct the jury sua sponte that his unrecorded statements should be viewed with caution. Id. at 27-29. Second, Petitioner claims that the trial court committed prejudicial error when instructing the jury on involuntary manslaughter pursuant to CALCRIM No. 580. Id. at 30-32.

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings. See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). To obtain federal habeas relief for error in the jury charge, the petitioner also must show actual prejudice from the error, i.e., that the error had a substantial and injurious effect or influence in determining the jury's verdict. Calderon v. Coleman, 525 U.S. 141, 146-47 (1998) (per curiam) (citing Brecht, 507 U.S. at 637). The error is not to be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. See Estelle, 502 U.S. at 72. Importantly, "[a]n omission, or

an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Henderson v. Kibbe, 431 U.S. 145, 155 (1977); Jeffries v. Blodgett, 5 F.3d 1180, 1195 (9th Cir. 1993).  The federal habeas court must defer to a state court's reasonable application of these principles.  Smith v. Spisak, 558 U.S. 139, 148-49 (2010); Waddington v. Sarausad, 555 U.S. 179, 191 (2009).

### 1.      CALCRIM No. 358

The jury heard evidence, at different times, that Petitioner had offered different explanations about where he first saw Kiara injured; i.e., in her bedroom or in the living room.  Brandon, 2012 WL 5193425, at *16.  According to the prosecution, these discrepancies tended to prove that Petitioner was lying about how Kiara came to be injured; i.e., if Petitioner had truly come upon her after she had been hurt, he would have recalled the circumstances more clearly.  Id.

The trial court instructed the jury on CALCRIM No. 358 (entitled "Evidence of Defendant's Statements"), as follows:

> You have heard evidence that the defendant made oral or written statements before the trial.  You must decide whether or not the defendant made any of these statements, in whole or in part.  If you decide that the defendant made such statements, consider the statements, along with all the other evidence, in reaching your verdict.  It is up to you to decide how much importance to give to such statements.

2CT 420.  This standard instruction includes an optional sentence that the trial court did not give:  "Consider with caution any statement made by (the/a) defendant tending to show (his/her) guilt unless the statement was written or otherwise recorded."  Brandon, 2012 WL 5193425, at *16 (quoting CALCRIM No. 358).)

There was no discussion before the trial court regarding whether to give this additional, cautionary sentence as part of the jury instruction.  Id., *16.  Nevertheless, on direct appeal, Petitioner argued that the trial court erred by not giving it sua sponte.  Id. The state appellate court rejected this claim, finding that Petitioner had failed to establish that it was reasonably probable that the jury would have reached a result more favorable to

him if the aforementioned optional sentence had been given.  The court explained as follows:

> Overall, the evidence of Brandon's differing accounts of whether he bathed Kiara and then returned her to bed was relatively insignificant when contrasted with other evidence in this case.  The manner of Kiara's death, the fact that she suffered injuries so severe and repetitive that they could not have been accidental, K.S.'s testimony that Brandon had hit Kiara, the fact that he was the only adult present at the time Kiara sustained her mortal injuries, and the suggestion that he had ongoing anger management issues constitute overwhelming evidence of Brandon's guilt.  Even if we assume arguendo that the trial court erred in not giving this cautionary instruction, we would conclude that any error was harmless.
> (See, e.g., People v. Carpenter, [(1997) 15 Cal.4th 312, 393].)

Id.  The state appellate court's rejection of Petitioner's instructional error claim was not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent.  Nor was it based on an unreasonable determination of the facts.  See 28 U.S.C. § 2254(d).

The state court reasonably determined that any error in excluding the cautionary sentence was harmless in light of the weight of objective evidence inculpating Petitioner in Kiara's death.  Id.  Dr. Crawford, an expert in pediatric medicine and child abuse evaluations, opined that given the severity of Kiara's injuries, she likely would have died from the beating within "probably minutes" or possibly hours of sustaining her injuries.  2RT 279.  Importantly, Petitioner admitted he was the only adult with Kiara from before 3:00 a.m. until the paramedics arrived over six hours later at around 9:00 a.m.  2RT 343-344, 451, 492.  The pathologist testified that the injuries were consistent with "a strike to the back or the back of the chest" and were not consistent with injuries from a fall, by being inflicted by Kiara's 5-year old and 6-year-old siblings, or by the "incorrect performance of CPR."  1RT 166-167.  There also was evidence of Petitioner's violence against Kiara.  K.S. testified that she had seen Petitioner punch Kiara in the stomach with his "closed fist" when Kiara defecated on the floor.  1RT 254-255.  Johnson testified that her daughter was feeling fine and displaying no signs of injury the day and evening before

her death.  2RT 332-340, 375.  Petitioner's next door neighbor heard him yell "I don't care if you die," the morning of Kiara's death.  1RT 176-180.

Moreover, Petitioner gave contradictory statements undermining his credibility.  He told the paramedics that other than having stomach aches earlier, Kiara had not acted out of the ordinary before her collapse.  Yet, Petitioner testified at trial that Kiara was "sluggish" and "moving slow" when she woke up.  1RT 213-214; 2RT 492.  He acknowledged that, when interviewed after Kiara's death, he told the police that Johnson never hit her children, but then testified at trial that Johnson "did it," i.e., caused Kiara's injuries that led to her death.  2RT 493-497.  He told the police he began performing CPR incorrectly by pushing on Kiara's stomach but the 911 operator said he was doing it incorrectly and explained the proper technique.  1RT 124-125.  The 911 recording contradicted Petitioner's statement, and did not corroborate his claim that he had incorrectly performed CPR.  2RT 303-305.

In sum, the record supports the state appellate court's determination that the failure of the trial court to give the optional, cautionary portion of CALCRIM No. 358 was harmless.  The significant evidence inculpating Petitioner in Kiara's death rendered any discrepancies in statements about when he first observed Kiara all but inconsequential.  The Court finds that the trial court's failure to provide the optional instruction of CALCRIM No. 358 does not merit habeas relief.  Relief on this claim is DENIED.

## 2.    CALCRIM No. 580

Petitioner complains that the trial court erred in instructing the jury on involuntary manslaughter.  As explained by the state appellate court:

> When instructing on the definition of involuntary manslaughter—one of the lesser included offenses of the charged offense of murder—the trial court told the jury that if the prosecution did not prove intent to kill or conscious disregard for human life, it was required to acquit Brandon of involuntary manslaughter. The correct jury instruction explains that if the jury finds no intent to kill or conscious disregard for human life, it is required to find the defendant not guilty of voluntary manslaughter. (See CALCRIM No. 580 [Jan. 2006 ed.].)

1    <u>Brandon</u>, 2012 WL 5193425, at *16.   Petitioner contends the trial court's erroneous use of

2    the term "involuntary manslaughter" instead of "voluntary manslaughter" deprived him of

3    the opportunity for an involuntary manslaughter verdict. Dkt. 1 at 30-32.  This claim fails

4    because the failure of a state trial court to instruct on lesser included offenses in a non-

5    capital case, such as this, does not present a federal constitutional question.  <u>See</u> <u>Solis v.</u>

6    <u>Garcia</u>, 219 F.3d 922, 929 (9th Cir. 2000); <u>Windham v. Merkle</u>, 163 F.3d 1092, 1105-06

7    (9th Cir. 1998).  Therefore, this claim is not cognizable on federal habeas review.

8         In any event, Petitioner has not otherwise satisfied the standard for habeas relief

9    based on instructional error, which requires a showing that the error "so infected the entire

10   trial that the resulting conviction violates due process."  <u>Estelle</u>, 502 U.S. at 72.  Here, the

11   state appellate court determined that while error occurred, it did not raise a federal

12   constitutional issue, and that any error was harmless:

13            Regardless of our view of this theory, it is clear that the trial
              court misinstructed the jury on the lesser included offense.
14            Brandon contends that the error raises federal constitutional
              issues, requiring us to test prejudice under the <u>Chapman</u>
15            standard.  (See <u>Chapman v. California</u>, <u>supra</u>, 386 U.S. at p.
              24.)  The California Supreme Court has rejected this view.
16            (<u>People v. Lasko</u> (2000) 23 Cal. 4th 101, 111-113.)  Instead,
              when a trial court misinstructs a noncapital jury on a lesser
17            included offense, we must apply the <u>Watson</u> standard to
              determine whether prejudice occurred.  We may only reverse a
18            conviction on a charged offense based on this error if our
              examination of the entire case makes it reasonably probable
19            that the defendant would have obtained a more favorable
              outcome in the absence of the error.  (<u>Id.</u> at p. 111; see <u>People</u>
20            <u>v. Watson</u> (1956) 46 Cal. 2d 818, 836.)

21            Brandon's prejudicial error argument fails to take into
              consideration the effect of the jury's guilty verdict on the other
22            count—that of assaulting Kiara by means of force likely to
              produce bodily injury, resulting in her death.  (Former
23            § 273ab.)  The challenged jury instruction does not undermine
              the assault conviction.  In reaching its verdict on the assault
24            count, the jury necessarily found that Brandon *committed an*
              *act* that would directly and probably result in the application of
25            force to the child.  Thus, the jury necessarily rejected
              Brandon's defense—offered against both charges—that he did
26            not *inflict the injuries* that mortally wounded Kiara.

27            The multiple, extensive and brutal injuries that Kiara sustained
              strongly suggest an intent to kill on Brandon's part. (See, e.g.,
28            <u>People v. Lasko</u>, <u>supra</u>, 23 Cal. 4th at p. 112.)  As the jury

United States District Court
Northern District of California

1
2
3

> concluded that Brandon actually injured Kiara, there is no reasonable possibility that it would have found that he inflicted those injuries without an awareness of the risk of great bodily injury or death posed by those severe injuries. [FN 24]  The instructional error was not prejudicial.  (See People v. Lasko, supra, 23 Cal. 4th at pp. 111-113.)

4
5

> [FN 24:] The assault verdict also required the jury to conclude that a reasonable person would have realized that these acts would probably result in great bodily injury.

6

Brandon, 2012 WL 5193425, at *16- 17 (emphasis and footnote in original).

7          The state appellate court's ruling that the error did not violate the federal

8   constitution does not amount to an objectively unreasonable application of clearly

9   established Supreme Court law.[6]  As an initial matter, there is no dispute by the parties that

10  the jury was correctly instructed on the lesser included offense of second degree murder,

11  which was *the offense of conviction*.[7]  In view of the jury's finding of second degree

12  murder—which is more serious than manslaughter—it is clear that the jurors were

13  unaffected by any error in the involuntary manslaughter instruction.  Moreover, as noted

14  by the state appellate court and in the record, the nature and extent of the Kiara's injuries

15  strongly suggested an *intent* to kill.  See, e.g., 1RT 176-180 (neighbor's testimony that

16  Petitioner exclaimed "I don't care if you die" on the same day Kiara died).  Therefore, the

17  Court finds that any instructional error did not have a substantial and injurious effect on

18  the jury's verdict.  Relief on this claim is DENIED.

19          **C.    Cumulative Error**

20          Petitioner argues that even if the errors described above were not prejudicial as

21  singular errors, the errors combined created cumulative prejudice that requires a grant of

22  habeas relief.  Dkt. 1 at 33.  Although a claim of cumulative error is unexhausted, this

23

24          [6] The Watson standard for harmless error applied by the state appellate court is equivalent to the Brecht standard applied on federal habeas review.  Bains v. Cambra, 204

25  F.3d 964, 971 n.2 (9th Cir. 2000).

26          [7] Under California law, the elements of premeditation and deliberation distinguish first and second degree murder. "A person who kills unlawfully and intentionally is guilty

27  of first degree murder if the intent to kill is formed after premeditation and deliberation. If the person kills unlawfully and intentionally but the intent to kill is not formed after premeditation and deliberation, the murder is of the second degree." People v. Gonzalez,

28  54 Cal.4th 643, 653 (2012) (internal citations omitted).

*United States District Court*
*Northern District of California*

Court will address the claim on its merits because it is clear that this claim is not colorable. See 28 U.S.C. § 2254(b)(2); see Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005) (holding that "a federal court may deny an unexhausted petition on the merits only when it is perfectly clear that the applicant does not raise even a colorable federal claim").

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned.  See Alcala v. Woodford, 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution). However, since there is no single constitutional error, Petitioner's cumulative error claim must necessarily fail.  See Hayes v. Ayers, 632 F.3d 500, 524 (9th Cir. 2011).

Accordingly, relief on his claim for cumulative error is DENIED.

## IV.   CERTIFICATE OF APPEALABILITY

No certificate of appealability is warranted in this case.  For the reasons set forth above, jurists of reason would not find this Court's denial of Petitioner's claims debatable or wrong.  See Slack v. McDaniel, 529 U.S. 473, 484 (2000).  Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a Certificate from the Ninth Circuit under Rule 22 of the Federal Rules of Appellate Procedure.  See Rule 11(a) of the Rules Governing Section 2254 Cases.

## V.   CONCLUSION

For the reasons stated above,

IT IS HEREBY ORDERED THAT:

1.      All claims from the Petition are DENIED, and a certificate of appealability will not issue.  Petitioner's request for an evidentiary hearing is DENIED.  Petitioner may seek a Certificate of Appealability from the Ninth Circuit Court of Appeals.

2.      The Clerk of the Court shall close the file and terminate any pending matters.

United States District Court
Northern District of California

31

1          IT IS SO ORDERED.

2   Dated:  3/30/17

3                                            SAUNDRA BROWN ARMSTRONG
                                             Senior United States District Judge
4

5   P:\PRO-SE\SBA\HC.14\Brandon0172.denyHC-rev.docx

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

32

1

2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

3

4

KAIAN BRANDON,

Case No. 4:14-cv-00172-SBA

Plaintiff,

5

6

v.

**CERTIFICATE OF SERVICE**

7

CALIFORNIA DEPARTMENT OF
CORRECTIONS AND REHABILITATION
(CDCR), et al.,

8

Defendants.

9

10

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

11

12

That on 3/31/2017, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

13

14

15

Kaian Brandon ID: AE-0690
California State Prison - Solano
P.O. Box 4000
Vacaville, CA 95696

16

17

18

Dated: 3/31/2017

19

20

Susan Y. Soong
Clerk, United States District Court

21

22

23

By:_____
Ivy Lerma Garcia, Deputy Clerk

24

25

26

27

28

United States District Court
Northern District of California